Hillsborough, }
Nov. 4, 1908. }

## LANE, *Adm'r*, *v.* MANCHESTER MILLS.

The fact that a servant was young and inexperienced may warrant a finding that he did not intelligently assume the risk of dangers to which he was exposed, especially when there is evidence that the peril was abnormal and not readily apparent to his understanding.

Where after the denial of a motion for a nonsuit in an action by a servant for personal injuries, the defendant introduces evidence upon the theory that the place was not an unsafe one for the plaintiff to work in, the jury may infer therefrom that the defendant did not inform the plaintiff of the danger.

An argument of counsel, that changes made in machinery subsequently to an accident are proof of its prior dangerous character, is merely the assertion of an erroneous rule of law; and in the absence of a special request for instruction as to the legal bearing of the evidence, it is presumed that the prejudicial effect of the statement was neutralized by proper charge of the court.

CASE, for negligently causing the death of the plaintiff's intestate. Trial by jury and verdict for the plaintiff. Transferred from the January term, 1908, of the superior court by *Plummer*, J.

David W. Lane, the plaintiff's intestate, was fourteen and a half years old at the time of his death, and had worked in the defendants' finishing room as a patter-boy for about seven months. Cloth about to be finished is brought into the north end of this room and run toward the south end of it in one continuous piece through six different machines. Between each of these machines and the one next south of it is a set of eight boxes in two rows of four boxes each. The boxes are four and a half feet high, and are used to hold the cloth as it comes from the machines. When the cloth comes through a machine it is carried over a reel located directly over the boxes and dropped into them. It is the duty of the patter-boys to direct the cloth as it falls into the boxes, so that it will be evenly folded. They move about on top of the boxes when they are doing this work, and sit or stand as suits their convenience, usually changing their position several times an hour. Lane worked on the set of boxes just north of the finishing machine—the last machine through which the cloth is run in the process of finishing—and had charge of the easterly four boxes of this set. The finishing machine is a washing machine. If one washing does not thoroughly cleanse the cloth, it is washed a second time.

When Lane first worked in this room the rewashing was done in another part of it, but for a month or more before the accident it had been done by the machine just south of where he worked. The cloth to be rewashed was brought into the finishing room on trucks. As it could not be left directly in front of the machine because of the boxes, a pole was lashed to an iron post just north and east of the boxes and an eye was fastened to a pipe over the west end of the finishing machine. The pole was four and a half feet and the eye six feet above the top of the boxes. The end of the cloth was carried up over the pole, through the eye, and down to the rolls which drew it into the machine.

It was the duty of the boy who ran this machine to stand between the pole and the truck and let the cloth be drawn through his hands in such a way that it would be fed into the machine with as even a tension as possible. The path of the cloth as it ran from the pole to the eye was diagonally across this set of boxes, and the distance between those points was eleven feet. The cloth sagged more or less between those points, the amount of sag depending on the way the boy held it; but when it was running in the ordinary way there was sometimes so much sag that if Lane, who was four feet tall, was near the middle of the boxes, there was not room for him to walk under the cloth without stooping. The evidence was conflicting as to how much of the time the machine was used in this way. There was evidence that

for a month or more before the accident it had been so used for a third of the time, and also that it had been so used only a very few times. On the day of the accident Lane was sitting on the west end of one of the middle boxes attending to his work. He got up, started east on the rail of the box, stooped when close to the moving cloth and passed under it, and resumed his work. A minute or two later the cloth sagged and struck the side of his face, and either threw him from the box, or caused him to lose his balance and fall from the box to the floor. The injury thus received resulted in his death the following day.

The defendants introduced evidence upon the theory that the work-place was not dangerous. The plaintiff's counsel in argument asked the jury to find from what they saw at the view that the defendants never used the contrivance for rewashing cloth after the accident. The defendants excepted to this argument and to the denial of their motions for a nonsuit and the direction of a verdict in their favor.

*Branch & Branch* and *Michael F. Shea*, for the plaintiff.

*Taggart, Tuttle, Burroughs & Wyman*, for the defendants.

WALKER, J. If the cloth had not become slack, the boy would not have been within its plane and would not have been struck by it. The circumstance, then, that rendered the place unsafe and dangerous, as claimed by the plaintiff, was the liability of the cloth to sag so that the boy could not pass under it without stooping. This was not a concealed defect of which the boy was ignorant, for just before his injury he attempted to pass under it by stooping. It may also be assumed that he must have known that the cloth was liable to be drawn up suddenly by the operation of the machinery, and that it might strike his head with some force if he was standing sufficiently near it. But it cannot be said that he realized or appreciated the fact that the blow might cause him to lose his balance and fall to the floor. While it is more than probable that he knew he might come in contact with the cloth as it was drawn up to a taut condition, it cannot be held that reasonable men might not find that he did not appreciate the force of the blow, or realize the effect it was liable to have upon him in the peculiar position his duties required him to occupy; that is, he might not have appreciated that his situation was a dangerous one. *Demars* v. *Company*, 67 N. H. 404; *Goodale* v. *York*, 74 N. H. 454.

But it is argued that the evidence is insufficient to support such a finding, and that it is as probable that he did, as that he did not,

appreciate the danger.   If it is conceded, as claimed by the defendant, that the burden of proving non-assumption of risk was upon the plaintiff, it cannot be said that no evidence was submitted in support of it.   It is common knowledge that a boy fourteen or fifteen years of age, though of average intelligence, is less likely to be cautious and apprehensive for his own safety when laboring about machinery in operation, than the ordinary man would be.   The immaturity of his judgment, due to lack of experience and observation, often suggests to his mind a course of conduct which an adult would at once see was attended with danger. This fact is some evidence bearing on the question whether the deceased intelligently assumed the risk of being hit by the moving cloth with sufficient force to cause him to lose his balance and fall to the floor.   *Disalets* v. *Company,* 74 N. H. 440.   It also appears that at the time he was injured he was engaged in the performance of his duties, moving about upon the boxes, and it might be inferred that such a boy under such circumstances would not consider the danger of his position.   The evidence was somewhat contradictory as to the number of times dry cloth had been carried to the boxes in this way during the time the boy worked there. The jury might have found that such an occurrence was very infrequent, and that running cloth in that way was an abnormal and unusual method of performing the work.   Although there was much evidence that this was not an unusual method of work, it cannot be held that reasonable men could not find otherwise. It might, therefore, be found that the boy was suddenly brought face to face with a practically new situation while attending to his duties, the danger of which was not apparent to his understanding.   Hence a finding that he did not appreciate the risk he incurred would seem to be amply supported by the plaintiff's evidence.

The evidence was also sufficient to support the finding that the defendant provided an unreasonably dangerous place for the deceased to work in.   No reason is suggested why a safe method of conveying the dry cloth to the boxes was impracticable, or why an unsafe method was necessary.   The jury, having had a view of the place and observed the machinery in operation, were warranted in finding from all the evidence that the defendant failed to perform its master's duty to the deceased in requiring him to work in a place which was not safe in view of his youthfulness and want of experience in similar situations, and that its negligence in this respect was the proximate cause of his injuries. These findings were matters of legitimate inference for the jury to draw.

But it is claimed by the defendant that the burden was upon

the plaintiff to prove not only that the defendant was negligent in failing to provide a reasonably safe place for the deceased, but in not warning him of the danger and risk of his employment, and that there was no evidence to support the latter ground of liability. If, however, it was incumbent on the plaintiff to prove that the master did not warn the decedent of the danger he encountered (*Bennett* v. *Company*, 74 N. H. 400), a point upon which no opinion is expressed, it cannot be said that the jury were not warranted in finding that he received no warning or instruction from the master upon this subject. Indeed, it may be conceded that from the plaintiff's evidence alone that fact could not be found; but if the alleged defect in the plaintiff's proof was afterward supplied by the defendant's evidence, the denial of the motion for a nonsuit for that cause cannot be reversed. "Where, after a motion for a nonsuit is erroneously denied, the defendant, instead of risking his case upon the exception, goes on with the trial and introduces evidence, the exception is waived if the deficiency in evidence is supplied by one side or the other before the case goes to the jury." *Burnham* v. *Railroad*, 69 N. H. 280, 282. The theory of the defence was that the place was not dangerous for a boy like the deceased to work in and that he fully understood his situation, and hence that no instruction or warning was necessary. If no instruction was necessary, the inference that none was given would not be an illogical or violent one. It is a reasonable deduction from the defendant's theory of defence and its evidence in support thereof. The silence of the defendant's testimony upon this subject, in view of the defence insisted upon, was an evidentiary fact in favor of the plaintiff, which supplied the defect, if any, in the plaintiff's evidence. It follows that if the motion for a nonsuit should have been granted when made, the exception to the denial of the motion was subsequently waived or abandoned by the defendant.

The defendant's final exception relates to the argument to the jury by the plaintiff's counsel. If it is susceptible of the construction that the defendant discontinued its dangerous method of work after the injury to the deceased, and that this was an admission that it was dangerous, the prejudicial character of the argument consisted, not in the statement of a material fact not in evidence, but in the assertion of an erroneous rule of law in its application to the facts. *Aldrich* v. *Railroad*, 67 N. H. 250. From the view which the jury took of the premises, presumably with the assent of the defendant, they saw the condition of the machinery and noticed that the use of the particular method of operation in question had apparently been discontinued. What they saw, without objection, became evidence for their consideration under instruc-

tions from the court.   The plaintiff's counsel did not attempt to
state facts of which there was no evidence.   At most, he was
merely stating, his view of the effect of the evidence.   But its
legal bearing or want of relevancy upon the question of the
defendant's negligence was a question of law for the court.   If in
argument counsel took an erroneous view of the law applicable to
such evidence, a request for proper instructions as to its relevancy
would have protected the defendant.   *Leavitt* v. *Company*, 72
N. H. 290; *Seeton* v. *Dunbarton*, 73 N. H. 134, 137.   In the
absence of such a request, it is presumed the court's charge was
proper upon the point suggested.

> *Exceptions overruled : judgment on the verdict.*

All concurred.