Carroll,        }
March 3, 1925.  }

ROBERT W. UPTON, *Adm'r*, v. CONWAY LUMBER COMPANY.

On the issue of the mental capacity of a person to execute a valid contract, the inquiry is merely whether the powers of his mind have been so far affected by disease as to render him incapable of transacting business like that in question.

The plaintiff in an action for personal injury is required only to make it more probable than otherwise that the negligence of the defendant caused the injury. It is not necessary that the relation between cause and effect be established to an absolute certainty.

The burden of proving non-assumption of risk is upon the plaintiff. But to sustain that burden he is not required specifically to negative all possible sources of information of the dangers of his employment. Nor need lack of instructions as to those dangers be proved by positive and direct testimony; it may be inferred from the facts and circumstances surrounding the case.

If the jury, in an action for personal injury, find that a release from liability was obtained of the injured person by the defendant through fraud or undue influence, that fact may be considered as evidence that the defendant was conscious of some infirmity in its defense, and that the precise infirmity was the failure of the defendant to give to the injured person adequate warning and instruction as to the danger of his employment.

A jury having come in for further instructions, a response by the foreman to an interrogatory by the court as to the decision reached by the jury upon a particular issue, though assented to by the other jurors, does not constitute a special verdict.

CASE, at common law, for negligently causing the death of Alexander P. Seeley, the plaintiff's intestate. Trial by jury and verdict for the plaintiff. Transferred by *Sawyer*, J., on exception to the denial of the defendant's motion for a directed verdict. The facts are stated in the opinion.

*William N. Rogers, Robert W. Upton* and *Edward C. Niles* (*Mr. Upton* and *Mr. Niles* orally), for the plaintiff.

*Tuttle, Wyman & Starr* (*Mr. Wyman* orally), for the defendant.

MARBLE, J. The plaintiff's intestate was forty-eight years old and had been employed by the defendant for some years as a common laborer. About a month before the accident he began to operate a splitting-saw, which was used by the defendant to skive the ends of car stakes. While engaged in this work he was struck by a stick

thrown from the saw and died ten weeks later as a result of his injury.

The defendant claims to be entitled to a directed verdict (1) because Seeley in his lifetime released the defendant from all liability on account of the accident, (2) because there is no causal connection between the alleged negligence and the injury, and (3) because the plaintiff has failed to show that Seeley was not warned and instructed concerning the dangers of his employment. These questions will be discussed in the order named.

1. A month after the accident an adjuster for a liability insurance company called on Seeley and obtained his signature to a release. The defendant pleaded the release specially, and the question of its validity was submitted to the jury. The answers of the foreman of the jury to the interrogation of the presiding justice will be considered later. The question here raised relates to the sufficiency of the evidence to prove Seeley's mental incapacity.

The inquiry "in all cases where incapacity to contract, from defect of mind, is alleged, is not whether a person's mind is impaired, nor if he is afflicted by any form of insanity, but whether the powers of his mind have been so far affected by his disease as to render him incapable of transacting business like that in question." *Dennett* v. *Dennett,* 44 N. H. 531, 538; *Young* v. *Stevens,* 48 N. H. 133, 136; *Roberts* v. *Barker,* 63 N. H. 332, 335.

On the second day following the accident Seeley was taken to an out-of-town hospital where he remained for about three weeks. His physician, who saw him a day or two after his return, testified that he was very much weakened and in a nervous and shaky condition, with attending paleness; that he was run down mentally as well as physically; and that in his (the doctor's) opinion he was not able "to do any business of much importance." Others testified that "he looked pretty near all in," and "could hardly walk;" that he "did not appear all right," that "he appeared very nervous and had something on his mind," and "did n't seem to be able to carry on any extended conversation." The insurance adjuster described at some length the details of the interview which led to the execution of the release.

It is obvious that this evidence tended to prove that Seeley had so far lost his mind as to be incapable of transacting business. Consequently there was evidence for the jury on this issue. *Pevear* v. *Pevear,* 79 N. H. 524, 525.

2. The negligence claimed was the failure of the defendant to

equip the saw on which Seeley was put to work with suitable guards for his protection. This saw, which was twenty inches or more in diameter, revolved toward the operator, coming up through a slot in a flat table three or four feet square. The center of the saw was about four inches below the top of the table. Save for a half-inch board fastened by leather hinges to a timber above the saw and designed as a sawdust protector, the saw was unguarded.

The plaintiff's evidence tended to prove that there are several devices in general use designed especially to prevent pieces of wood from being thrown back toward the operator. One of the most common of these devices is a wedge-shaped piece of metal known as a spreader. The spreader is fastened to the table in line with and directly behind the saw, with the sharp edge toward the saw, and of sufficient height to clear any piece of wood which is to be split. As the timber passes beyond the saw, the spreader holds the split portions apart and prevents them from binding and catching on the back of the saw. Another safeguard comprises a chute or opening under the saw, so placed that the severed pieces will drop through the aperture as fast as they are cut off. Still another device is a stationary protecting board placed in the same relative position as the sawdust protector but built of heavier wood.

There was no eyewitness to the accident, but a workman nearby heard Seeley "making stakes as usual." Suddenly his attention was attracted by a noise which indicated to him that something was on the saw. He started forward and met Seeley coming toward him holding on to his abdomen. Seeley told him he had been hit by a stick from the saw. In front of the saw-bench the witness found a piece of wood from ten to fourteen inches long with irregular marks on it signifying that it had been thrown by the saw. There were no edgings near the table.

The defendant maintains that this evidence fails to disclose any causal connection between Seeley's injury and the negligence charged, arguing that a spreader, if in use at the time, would not have been effective because the fragment split from the stake was shorter than the width of the saw; that it is purely conjectural whether the stick which was found came in contact with the front, top, or back of the saw; and that Seeley may even have thrown it upon the saw himself.

The answer to this argument is, that there was evidence that the vibration of the saw (most marked when the saw leaves the wood) is necessarily communicated to the table and that the effect of this vibration would be to move a loose piece of wood toward the back

of the saw. Moreover a chute, if properly constructed, would allow pieces too short to reach the spreader to fall through the opening as soon as cut. So far as the suggestion that Seeley may have thrown the stick upon the saw himself is concerned, it may be said that since the evidence shows that no other piece of wood was near the table after the accident, it is a fair inference that the last stick that was cut was the one thrown by the saw. This stick was discovered some four feet in front of the saw-bench very near where Seeley stood while pointing stakes. This would plainly tend to show that Seeley was not up at the bench picking up edgings at the time he was injured, but back some distance from the saw. Up to the moment of the accident Seeley was "making stakes as usual" and the saw "was going along as usual." It could therefore be found that the accident was not caused by his own act. *Bouthet* v. *Company*, 75 N. H. 581, 583.

It is never necessary that the relation between cause and effect be established to an absolute certainty. "No such burden rested on the plaintiff. He was not bound to exclude all possible causes of death. He was required only to make it more probable than otherwise that the fact was as he claimed it. The rule of *Deschenes* v. *Railroad*, 69 N..H. 285, that the jury cannot be permitted to determine by guess or conjecture between two equally probable causes of the injury, for one only of which the defendant is responsible, has no application unless the existence of a sufficient cause or causes for the injury, aside from the negligence charged, is conceded or conclusively proved." *Boucher* v. *Larochelle*, 74 N. H. 433, 434. See also *Angelico* v. *Shattuck, Inc.*, 80 N. H. 290, 291; *Lockwood* v. *Express Co.*, 76 N. H. 530, 537; *Crawford* v. *Railroad*, 76 N. H. 29, 31; *Lydston* v. *Company*, 75 N. H. 23, 25.

3. At the close of the plaintiff's case the defendant rested on the issue of original liability, and defendant's counsel announced his intention of introducing evidence merely on the questions raised by the release.

The defendant claims that the evidence is insufficient to sustain the verdict because the plaintiff has failed to show that Seeley was not warned and instructed as to the dangers of his employment. The question whether or not it is incumbent on a plaintiff to prove lack of warning was before the court in *Lane* v. *Manchester Mills*, 75 N. H. 102, 106, but was not there decided.

The rule in this jurisdiction that the burden is on the plaintiff to prove his non-assumption of the risk is too elementary and has been too recently affirmed to require the citation of authority. A plaintiff

in order to be relieved of the duty of going forward must produce "a quantity of evidence fit to be considered by the jury and to form a reasonable basis for the verdict." 4 Wig. Ev., s. 2487. In other words, he must establish a *prima facie* case. And this is equally true whether the issue tried involves an affirmative or a negative proposition.

The fundamental elements of the doctrine of assumed risk are knowledge and appreciation of the danger. Instruction is but one means by which knowledge and appreciation may be attained, and the burden would be onerous indeed that required a plaintiff, in order to "invoke the judgment of the trier of fact" (*State* v. *Lapointe, ante,* 227, 236), to first negative all possible sources of information.

It is undoubtedly true that the servant must show, inferentially at least, that his ignorance is justifiable under the circumstances. *Camire* v. *Company,* 79 N. H. 531. But this is far from saying that he must elucidate in advance every conceivable circumstance which might tend to endow him with knowledge. It is not necessary for him "to assert his ignorance in terms" (*Bjork* v. *Company,* 79 N. H. 402, 406), nor is his lack of knowledge and appreciation inexcusable merely because express warning and instruction have been given. In all cases the warning or instruction must be sufficient fully to inform the servant of the danger. *Willis* v. *Company,* 75 N. H. 453, 455. But if instead of receiving instruction from the master he obtains through other channels sufficient knowledge to understand and appreciate his peril, he cannot recover. *Paige* v. *Company,* 80 N. H. 439. On the other hand, there are occasions where any warning the master may give is insufficient. *Richardson* v. *Adams,* 77 N. H. 571.

From this, it would seem to be incontrovertible that, whether instructions have been given or not, the ultimate consideration on the issue of assumed risk is the extent of the servant's knowledge and appreciation.

It is the defendant's position, however, that the essential inquiry, by whatever name called, relates primarily to the master's fault, and since the master's duty involves a choice (that of furnishing his servant a reasonably safe appliance or giving him adequate notice of its unsafe condition) the servant in order to recover must show that the master has failed in the performance of each alternative.

As a practical matter, it makes little difference whether we say that a master who furnishes an unsafe appliance is negligent and that a servant who knows and appreciates his peril assumes the risk of

that negligence, or whether we say that the master's duty is an alternative one (*Kindellan* v. *Railway*, 76 N. H. 54, 55); for lack of instructions need not of necessity be proved by positive and direct testimony, but may be inferred from the facts and circumstances surrounding the case. Thus, in *Lane* v. *Manchester Mills, supra,* it was held that the failure to warn and instruct could be inferred from the theory of the defence that no warning or instruction was necessary; and the case of *Bouthet* v. *Company, supra,* 582, 583, holds that in the absence of evidence that the plaintiff's intestate was notified of the danger by the defendants, it could be found that "they never told him of it."

According to the plaintiff's evidence, Seeley's prior occupation had been that of a teamster and common laborer. His appearance while working about the saw is described as "kind of clumsy" and "green." During the month of his employment as a sawyer he ran the saw three or four times a day for only fifteen or twenty minutes at a time. He was required to skive each stake to the dimensions of an iron socket. It was heavy work, "handling round lumber, practically logs." He "would be cutting most of it against the grain," and "tapering it to the size of the iron on the car." This task demanded skill; it was characterized as "pretty dangerous," and the danger was not apparent. There was testimony to the effect that a man might operate the saw "a good while and still not see any danger and not realize it." He could be taught the danger, however, by somebody's "staying there with him and showing him."

If the fact that Seeley was clumsy and green in the performance of this work is not in itself sufficient evidence of the defendant's failure to instruct and warn him, there are other circumstances from which, taken in connection with his apparent ignorance, such failure may be inferred.

On the issue relating to the validity of the release, questions of fraud and undue influence as well as the question of mental incapacity were raised. The presiding justice at the close of his charge instructed the jury that if they found the release had been secured by fraud or undue influence, they might consider the fact that it was so obtained for whatever assistance it might be to them "in deciding the question of the defendant's negligence." *Graham* v. *Weber,* 79 N. H. 393.

At the defendant's request a special question with reference to fraud and undue influence was submitted. The jury, having apparently found both mental incapacity and fraud, asked for further

instructions before answering the special question. The court, after inquiring if all were agreed on the question of mental incapacity, informed the foreman that the special question need not be answered. The response of the foreman to the interrogation of the court, though assented to by the other jurors, was not a special verdict. *Tierney* v. *Granite Works,* 79 N. H. 166. That being so, the general verdict prevails.

Under the charge, the jury may well have found that the defendant was conscious of some infirmity in its defense "which was liable to defeat it in a fair trial" (*Graham* v. *Weber, supra; Pearson* v. *Company,* 69 N. H. 584), and that the precise infirmity was the failure of the defendant to give Seeley adequate warning and instruction.

It follows that there was no error in the denial of the defendant's motion.

*Exceptions overruled.*

All concurred.